UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| FRANKLIN MEMORIAL HOSPITAL,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | Civ. No. 07-125-B-S |
| ) | |
| BRENDA M. HARVEY, Commissioner  ) | |
| of the Maine Department of Health  ) | |
| and Human Services,  ) | |
| ) | |
| Defendant  ) | |

**RECOMMENDED DECISION**

Franklin Memorial Hospital seeks a declaratory judgment from the Court to the effect that Maine's Free Care Law, which requires hospitals to provide free health care to certain low-income individuals, is unconstitutional under the Fourteenth Amendment's Due Process Clause because it takes private property for public benefit without affording just compensation. The Court has referred the parties' cross-motions for summary judgment to me for a recommended decision. I recommend that the Court deny the plaintiff's motion (Doc. No. 24) and grant the defendant's motion (Doc. No. 20) as to the federal takings claim. I further recommend that the Court dismiss the pendent state law takings claim.

**FACTS**

The following facts are material to the motion for summary judgment. The facts are drawn from the parties' statements of material facts filed in accordance with Local Rule 56. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a

summary judgment motion); <u>Toomey v. Unum Life Ins. Co</u>., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Maine law imposes an "access requirement" on hospitals and certain other health care providers that requires them to provide certain health care services to individuals who are eligible for "charity care" in accordance with regulations set by the Maine Department of Health and Human Services.  22 M.R.S. § 1715(1).  The parties refer to the access requirement and the related guidelines as Maine's "Free Care Laws."  It is a civil violation to fail to provide such charity care and a violation is subject to a forfeiture of between $200 and $500 per patient denied access.  <u>Id.</u> § 1715(2)(A).  Any affected patient may petition the Superior Court for an order mandating the performance of the access requirement.  <u>Id.</u> § 1715(2)(B).  The Department is tasked with the obligation to "adopt reasonable guidelines for policies to be adopted and implemented by hospitals with respect to the provision of health care services to patients who are determined unable to pay for the services received."  <u>Id.</u> § 1716.

Historically, the Department's guideline has been that free care services must be afforded to patients with income below the federal poverty guideline ("FPG").  (Def.'s Statement ¶¶ 1-2, Doc. No. 22.)  However, effective July 1, 2007, the Department amended its guideline to require the provision of free health care services to patients with income below 150% of the FPG, in accordance with a legislative resolve that it do so.  (<u>Id.</u> ¶ 5;  Pl.'s Statement ¶¶ 7-8, 19-21, Doc. No. 25.)  Defendant Brenda M. Harvey is the Commissioner of the Maine Department of Health and Human Services and is the state official responsible for administering Maine's Free Care Laws.  (Pl.'s Statement ¶ 3.)

Plaintiff Franklin Memorial Hospital is a non-profit corporation that operates an acute care hospital in Farmington, Maine.  (<u>Id.</u> ¶ 9.)  Its physical plant includes the hospital proper,

additional office space for its physicians, and parking space associated with both the hospital and the physicians' offices.  (Pl.'s Additional Statement ¶ 14-15, Doc. No. 32.)  Franklin Memorial is a public-benefit charity, and community health is one of the elements of its mission.  (Id. ¶ 13.) Franklin Memorial has consistently complied with Maine's Free Care Laws and has also provided free care to patients in excess of the requirements set by the Free Care Laws.  (Id. ¶ 12.) However, prior to the Department's amendment to the eligibility threshold, Franklin Memorial would use a sliding scale for purposes of billing individuals with incomes between 100% and 250% of the FPG.  (Id. ¶ 17.)  At the bottom of that scale, an individual would be expected to pay 20% of the cost of the services received and, at the top, 80%.  (Id.)  If Franklin Memorial were not subject to the Free Care Laws it would consider ability to pay for services on a case-by-case basis and would continue to provide free or reduced-cost services.  Additionally, for some of its patients, Franklin Memorial would offer the option of making payment, in whole or in part, through "volunteer" services under its "contract for care" program.  (Pl.'s Opposing Statement ¶ 20, Doc. No. 32;  Pl.'s Statement ¶ 11.)  Currently, under this program, patients who receive a discount based on an income level between 150% and 250% of the FPG "can commit to volunteer to provide services . . . in exchange for the hospital committing to charging-off the remaining balance.  (Pl.'s Additional Statement ¶ 5.)  Franklin Memorial would employ its sliding scale and contract for care program with all of its low income patients were it not subject to Maine's Free Care Laws.  (Pl.'s Opposing Statement ¶ 14;  Pl.'s Additional Statement ¶¶ 7-10.) The Department admits that, if Franklin Memorial did not have to provide free care to certain eligible individuals, the additional revenue that Franklin Memorial could obtain in exchange for the provision of health care services would enhance its ability to recapitalize and provide services to the community at large.  (Pl.'s Statement ¶ 27.)

3

It is undisputed that Maine's Free Care Laws require hospitals like Franklin Memorial to provide free care to individuals who have sufficient assets to pay for all or part of their care, because capital gains, cash deposits or savings, and other property assets are not factored into the Department's income qualification guidelines.  Thus, Maine's Free Care Laws sometimes require hospitals to provide free care to individuals who have substantial wealth, but little income.  (Pl.'s Statement ¶¶ 12-15;  Def.'s Opposing Statement ¶¶ 12-15, Doc. No. 30.)  If Franklin Memorial had the choice, it would not provide free care to such individuals.  (Pl.'s Statement ¶ 16.)

Franklin Memorial spends an average of $4,700 per patient for in-patient[1] services, including $1,800 in compensation for its staff, $1,200 worth of medical goods and supplies, and $1,700 in room-and-board services.  (Pl.'s Additional Statement ¶ 18-21.)  Franklin Memorial has provided free care goods and services to patients well in excess of the average cost, including over $31,000 for one patient in 2006.  (Pl.'s Statement ¶¶ 29-38.)  In 2006, Franklin Memorial provided mandatory free care to approximately 127 people.  In 2007, with the change in the eligibility requirements, Franklin Memorial provided free care to 238 people.  (Id. ¶¶ 23-24.)

For the fiscal year ending June 30, 2007, Franklin Memorial provided approximately $1,574,000 in free care, of which less than half was mandated by the Free Care Laws.  (Def.'s Statement ¶ 29.)  The mandatory free care component (approximately $661,000) amounts to 0.51 percent of Franklin Memorial's gross revenue for the fiscal year.  (Id. ¶ 30;  Pl.'s Statement ¶ 20.)  Debt owed to Franklin Memorial for services provided in the fiscal year ending June 30, 2006, which Franklin Memorial considers to be uncollectable "bad debt," was $2,899,056.  (Def.'s Statement ¶ 34.)

---

[1]    The parties agree that the Free Care Laws require hospitals to provide both out-patient and in-patient services.  (Pl.'s Statement ¶¶ 5;  Def.'s Opposing Statement ¶¶ 5-6.)

The average income for households in Franklin County is one of the lowest averages for any county in Maine.  The average per family income in Franklin County is only 160% of the FPG.  (Pl.'s Statement ¶¶ 7-8.)

### DISCUSSION

With this civil action, Franklin Memorial Hospital seeks to strike down Maine's Free Care Laws on the ground that the regulations effectuate a taking of private property for public use without just compensation.  I conclude that Franklin Memorial's presentation does not justify a finding that just compensation is required in order to carry out the regulatory requirements imposed by Maine's Free Care Laws.  The following discussion addresses the federal constitutional standards.  As for the claim advanced under the Maine Constitution, I recommend that the Court decline to retain supplemental jurisdiction and dismiss it, without prejudice, so that the state courts may address Franklin Memorial's claim of a taking under the Maine Constitution in terms of the Law Court's potentially distinct legal standards.

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  P. R. Elec. Power Auth. v. Action Refund,

5

515 F.3d 57, 62 (1st Cir. 2008).  If such facts and inferences could support a favorable verdict for

the nonmoving party, then there is a trial-worthy controversy and summary judgment must be

denied.  Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

**A.      Takings under the U.S. Constitution**

Regulatory takings come in four stripes, two of which concern *per se* takings and two of

which involve a more nuanced, balancing approach.  On the *per se* side are (1) those regulatory

takings where the government either forces an owner of property to suffer a permanent physical

invasion of his property or else (2) completely deprives an owner of *all* economically beneficial

use of property.  Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538, 548 (2005) (citing as

exemplars, the regulations addressed in Loretto v. Teleprompter Manhattan CATV Corp., 458

U.S. 419 (1982), and Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992),

respectively).  On the other side are (3) regulatory takings in which the government imposes

economic burdens that interfere with investment-back expectations, where the character of the

government action does not merely adjust the benefits and burdens of economic life to promote

the common good and (4) land-use exactions that require an owner to permit public access to

property as a condition of obtaining the permits necessary for the owner's intended use of the

property, where the exactions bear little or no relation to factors that might justify denial of the

permit.  Id. at 538-39, 546-48 (citing Penn Central Transp. Co. v. New York City, 438 U.S. 104

(1978) for the third category and Dolan v. City of Tigard, 512 U.S. 374 (1994), for the fourth).

Here, Franklin Memorial argues that the Free Care Laws amount to a *per se* regulatory

taking because they permanently deprive the hospital of its personal property, including medical

supplies and the labor of its staff, without compensation, and because they deprive hospitals of

the right to exclude others from the same and from making entry onto their premises.  (Pl.'s

6

Motion at 3-7, Doc. No. 24.)  Franklin Memorial likens the Free Care Laws to the regulation at

issue in Loretto, comparing the mandatory provision of free services on its premises to a

permanent physical occupation.  (Id.)  In marked contrast, the Commissioner describes the Free

Care Laws as merely adjusting the benefits and burdens of economic life, without harming any

reasonable investment-backed expectations.  (Def.'s Mot. at 7-8, Doc. No. 20.)  She likens the

Free Care Laws to regulations requiring attorneys to provide *pro bono* legal services, or to minor

revenue restrictions, and argues that Franklin Memorial, as a public benefit charity, cannot

reasonably complain of an economic imposition amounting to only half a percent of its gross

annual revenues, especially when Franklin Memorial voluntarily provides even more free

services to the public than what is required under the Free Care Laws.  (Id. at 8-13.)

Of the four alternative categories of regulatory takings, the parties' respective arguments

focus on the Penn Central factors of the third category of cases, informed by the *per se* rule

adopted for cases, like Loretto, coming within the first category.  Because a review of the

category one cases reflects that the *ad hoc* approach and the Penn Central factors are operating in

the background, I structure my discussion to follow the Penn Central factors and discuss the

special concern of the category one cases in the Penn Central framework.  See Loretto, 458 U.S.

at 426;  Philip Morris v. Reilly, 312 F.3d 24, 35 (1st Cir. 2002) (concluding that an application of

the Penn Central factors "is not practically different from utilizing *per se* rules," which,

practically speaking, are "simply shortcuts").

In Penn Central, the Supreme Court acknowledged that it could not develop any "set

formula" for deciding regulatory takings cases, but it flagged three factors to guide the courts' *ad

hoc* consideration of such claims:  (1) the extent to which the regulation interferes with

investment-backed expectations;  (2) the economic impact of the regulation on the claimant;  and (3) the character of the governmental action.  438 U.S. at 124.  I consider each factor in turn.

### 1.    Investment-Backed Expectations

Franklin Memorial says that its personal property is being "socialized and taken" because the Free Care Laws "physically appropriate and redistribute goods and services and assets." (Pl.'s Mot. at 7.)  Focusing on the distinct items of property and specific services, Franklin Memorial says that the Free Care Laws work a "total appropriation" of the same and that it should be able "to expect that its goods and personal property items would be protected."  (Id. at 9.)  The Commissioner responds that Franklin Memorial, as a non-profit entity, does not have any "investor-backed" expectations because "non-profit hospitals do not have investors in any traditional sense."  (Def.'s Mot. at 13.)  Moreover, the Commissioner argues that a hospital knows enough about the health care environment to know that the State "might take action" affecting its revenues.  (Id.)  Finally, the Commissioner notes that an expectation of profit is questionable given the extent to which Franklin Memorial provides free services above and beyond the requirements of the Free Care Laws.  (Id. n.12.)

I conclude that the investment-backed expectations factor cannot support a finding that the Free Care Laws effectuate a taking of Franklin Memorial's property.  I draw this conclusion from the fact that the existence of the Free Care Laws necessarily informs the expectations that Franklin Memorial must have when it prospectively "invests" in medical supplies or in its staff. The undisputed facts demonstrate that Franklin Memorial understands that a portion of the medical supplies it purchases and a portion of the time that its staff expends on patients simply will not produce a return on investment.  This understanding grows out of Franklin Memorial's knowledge of the Free Care Laws and out of its own non-profit health care mission.  In other

8

words, viewed prospectively, Franklin Memorial restocks supplies and retains staff knowing that a portion of the supplies and labor will be subject to the regulatory obligations of the Free Care Laws.  It is not a simple matter of having owned a stockpile of supplies and labor capacity, all previously paid for, that suddenly, out of the blue, were confiscated by operation of the Free Care Laws.  Franklin Memorial has been operating for years under this regulatory regime.

Even if this regulatory program could be viewed statically, as suddenly overriding preexisting expectations in regard to specific supplies or labor, Franklin Memorial expresses only a desire to collect some fraction of what it would ordinarily charge for supplies and services, without expressing or quantifying any expectation of actually *profiting* from these items in the absence of the Free Care Laws.  Although there would undoubtedly be instances in which Franklin Memorial would be able to realize a profit from supplies and services provided to some individual patients who qualify for free care, but who could and would pay the market rate, there is no indication in the record that, in the aggregate, the provision of supplies and services to the Free Care Law patient population would yield a return on Franklin Memorial's investment.  With respect to this patient population, the facts presented do not enable the Court to even infer that Franklin Memorial could conceivably operate a profitable enterprise, due to the fact that Franklin Memorial provides free care even beyond its obligations under the Free Care Laws. Consequently, the record is not developed in a way that depicts frustrated investment-backed expectations.  This sort of scenario does not support a finding that a taking has occurred based on any harm to distinct investment-backed expectations.

### 2.    Economic Impact

In its discussion of the economic impact of the Free Care Laws, Franklin Memorial focuses on the value of the medical supplies and services it provides for free to eligible

9

individuals, asserting that, in 2007, the Free Care Laws resulted in the appropriation of supplies and services valued at approximately $661,000.  (Pl.'s Mot. at 9.)  Against this presentation, the Commissioner contends that the $661,000 figure is not that significant because it represents roughly one-half of one percent of Franklin Memorial's gross revenue for 2007, and because Franklin Memorial voluntarily provides free care of greater value than the value of the mandatory free care.  (Def.'s Mot. at 12-13.)  Although it would be silly to suggest that $661,000 is not a significant sum of money, I agree with the Commissioner that the size of that number does not automatically conclude the "economic impact" inquiry.  The issue is the "economic impact *on the claimant*," Penn Central, 438 U.S. at 124, and not merely the size of the dollar figures involved.  The undisputed facts reflect that the Free Care Laws result in lost theoretical[2] sales amounting to one-half of one percent of Franklin Memorial's gross revenue and that Franklin Memorial enters into even more transactions, on a voluntary basis, that result in the loss of an even greater amount of potential revenue.  This presentation is certainly not sufficient on its own to warrant a finding that the Free Care Laws are unconstitutional.  Insofar as the inquiry is designed to identify regulations that impose burdens functionally equivalent to a "classic" taking (*i.e.*, a taking on par with total condemnation), Lingle v. Chevron, 544 U.S. at 539, the economic impact at issue for this claimant in this case is simply not significant enough to independently compel a finding that the Free Care Laws work a taking.

---

[2]      As discussed in the preceding section, Franklin Memorial does not indicate what revenue it might realistically expect to realize from its provision of supplies and services to this patient population.  Franklin Memorial indicates that, for some patients, it would collect a fraction of its normal revenues or payment in the form of "volunteer" services.  Presumably, the value of whatever payments it might collect, plus the value of whatever services Franklin Memorial might obtain, would be less than the $661,000 figure, which further militates against a finding of a significant economic impact.  The measure of just compensation is the property owner's loss, not the public's gain.  Brown v. Legal Found., 538 U.S. 216, 235-36 (2003).

### 3.        Character of the Government Action

Franklin Memorial argues that the character of the government action effectuated by the Free Care Laws is appropriation of its supplies and services and physical invasion of its premises by the public, without just compensation.[3]  (Pl.'s Mot. at 6-7, 9-11.)  Franklin Memorial argues that this basic fact requires that the Court find a taking *per se*.  (Id. at 4-7.)  The Commissioner argues that the Free Care Laws are the stuff of traditional police power regulation, given the health care context, and that the Free Care Laws merely adjust the benefits and burdens of economic life to advance the common good.  (Def.'s Mot. at 7.)  As for why the burden of the Free Care Laws should fall squarely on hospitals, the Commissioner asserts that it is because, like attorneys, health care providers owe a duty to perform some amount of *pro bono* work.  (Id. at 10-12.)  If a taking can be made out on this record, it is because of the character and design of the Free Care Laws, which mandate access to real property and the transfer of all possessory interest in personal property to members of the public, while prohibiting the owner from charging a fee.

When government regulation results in a permanent physical occupation of real property it amounts to a taking, *per se*.  "In general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, [the

---

[3]        Franklin Memorial appears to be of two minds when it comes to describing the nature of the government intrusion.  On the one hand, Franklin Memorial states that its case is entirely about the appropriation of its medical supplies and services, seemingly conceding that its case is only about personal property and not real property.  (Pl.'s Mot. at 9:  "[T]his case involves personal property (medical goods and services) rather than real property.")  At odds with this representation, however, are factual statements concerning its physical plant, including the fact that it has parking lots on its premises and certain references to in-patient services as distinct from out-patient services.  These references do not seem material unless the physical presence of Free Care Law patients is objectionable to Franklin Memorial.  Moreover, on the same page of its motion that Franklin Memorial seemingly concedes that its case concerns personal property exclusively, Franklin Memorial interjects a footnote stating that it is "required to admit and house patients who need admission to a hospital for free without the expectation of payment," likening that to a permanent occupation by the government.  (Pl.'s Mot. at 9 n.4.)  It reiterates a real property invasion theory in its reply, as well.  (Pl.'s Reply at 6, Doc. No. 35.)

Constitution] require[s] compensation." Lucas, 505 U.S. at 1015 (addressing zoning regulation prohibiting land development, found to deprive the land in question of all economically beneficial use); see also id. at 1028 (restricting the holding to "the case of land").  Thus, for example, when the federal government sought to enforce a public right of access to a private water body after improvements connected it with navigable waterways within the Army Corp of Engineers' regulatory jurisdiction, the Supreme Court held that it could only do so if it afforded just compensation to the owner.  Kaiser Aetna v. United States, 444 U.S. 164, 168-69, 178-80 (1979) (stating, at 179-80, "that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation").  Kaiser aptly illustrates that the imposition of a public servitude on land, where free public entry was formerly denied, is a taking that must be compensated.  Id. at 180 (observing that the servitude "will result in an actual physical invasion" where access was previously conditioned on payment of an annual fee).  Similarly, when New York passed a law requiring landlords to permit cable companies to install cable television lines and related equipment on their apartment buildings in exchange for a nominal fee, the Supreme Court held that a taking had occurred due to the "permanent physical occupation of real property."  Loretto, 458 U.S. at 421, 426 (holding "that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve") & 436 (stating that it is a "special kind of injury when a *stranger* directly invades and occupies the owner's property").  The taking in Loretto arose, in essence, from the fact that the law "*required* landlords to permit permanent occupation of their property by cable companies."  FCC v. Fla. Power Corp., 480 U.S. 245, 251 (1987).

Franklin Memorial emphasizes the following language from Loretto:  "[t]he one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, 'regularly use', or 'permanently' occupy, space or a thing which theretofore was understood to be under private ownership."  Id. at 427 n.5 (quoting Michelman, Property, Utility, and Fairness:  Comments on the Ethical Foundations of "Just Compensation" Law, 80 Harv. L. Rev. 1165, 1184 (1967)).  (Pl.'s Mot. at 6.)  Franklin Memorial explains that the Free Care Laws enable the public to use its medical supplies, staff and facilities, thereby destroying its rights to control the use and disposition of its property.  (Pl.'s Mot. at 6-7.)

I conclude that the facts of this case do not warrant the application of a *per se* rule such as was applied in Loretto.  I base this conclusion on the essentially *ad hoc* consideration that Franklin Memorial, unlike the marina owner in Kaiser or the landlord in Loretto, operates a business that is designed to serve the public at large and has historically served the public at large regardless of ability to pay.  Franklin Memorial complains of its inability to require payment for its services and related supplies, but it does not contend that it would actually exclude any member of the public from its premises based on inability to pay for access.  Quite unlike the claimants in Kaiser and Loretto, there is no evidence here that Franklin Memorial has ever exercised its right to exclude the public in general from its premises.  Consequently, from an *ad hoc*, practical perspective, the Free Care Laws do not result in or cause a physical invasion of Franklin Memorial's real estate by the public because the public's presence is a basic, preexisting aspect of Franklin Memorial's business.  As stated in FCC v. Florida Power, "it is the invitation

. . . that makes the difference."  480 U.S. at 252.[4]  Indeed, as revealed by Pruneyard Shopping

Ctr. v. Robins, the fact that the public's presence is a component of Franklin Memorial's

operation and the fact that there is no evidence that the presence of charity patients unreasonably

impairs the value of Franklin Memorial's premises, preclude a finding that there is a physical

invasion of real estate requiring an application of a *per se* rule.  447 U.S. 74, 82 (1980)

(assessing the burden imposed by a state constitutional ruling that protected the public's right to

engage in free speech and petition activities at a privately owned shopping center and finding a

taking had not occurred where the interference with the owner's right to exclude others from real

estate was only transitory and the public's presence was an ordinary incident of the business

operation);  see also Loretto, 458 U.S. at 434 (discussing this aspect of Pruneyard).

　　　　Franklin Memorial argues, nevertheless, that the *per se* rule applies equally with respect

to the "appropriation" of its personal property, encouraging the Court to reach the same result as

the D.C. Circuit Court of Appeals did in Nixon v. United States, 978 F.2d 1269, 1284 (D.C. Cir.

1992).  There, in a discussion of the "*per se* takings doctrine," the court held that there is no

logical distinction between the physical invasion of real property and the appropriation of

personal property and that "[a]ny distinction along these lines would be purely artificial."  Id. at

1285.  Turning to the facts of the case, the court reasoned that a *per se* taking of Nixon's

---

[4]　　　Florida Power is, of course, distinguishable from this case.  In Florida Power, the Supreme Court concluded that a regulation on rates of reimbursement for leased space was not a taking because the owner was not required to lease space.  Here, the Free Care Laws are drawn in terms of requiring access.  Nevertheless, the particular facts of this case demonstrate that Franklin Memorial would invite the patients in question onto its premises regardless, though it would prefer in some cases to condition access on terms calling for some measure of compensation.  As of yet, however, it does not appear that Franklin Memorial has ever sought to exercise its right to exclude others based on ability to pay.  See also Yee v. City of Escondido, 503 U.S. 519, 528 (1992) (characterizing the pivotal issue as whether there is regulatory compulsion "over objection" to provide access).  Franklin Memorial could have based its case on an assertion that it would deny access to its premises to those unable to make payment for its services, rather than on the much tamer assertion that it would deny *free* access to some.  It has chosen not to present its case in those terms or, if it meant to do so, it has failed to offer the factual predicate necessary to establish that it would outright deny physical access to its premises, supplies, or services for some or all of the patients whom the Free Care Laws deem unable to pay.

presidential papers was evident from the fact that the law in question "unambiguously provides for federal *possession* of the materials," while only providing Nixon with "some access rights." Id.  Characterizing the standard, the court stated:  "The test must be whether the access rights preserve for the former owner the essential economic use of the surrendered property."  Id. at 1286.  Because Nixon had "lost all bargaining power" in relation to his papers, as well as the "right unilaterally to exclude others from the materials," the court concluded that the law resulted in an uncompensated taking.  Id.

The Commissioner rejects the notion that mandatory access to health care supplies and services is similar to the appropriation of personal articles like President Nixon's papers, wryly noting that "[b]andages, gauze, tape, slippers, mesh underwear, saline, and even professional medical services are hardly on par with Mr. Nixon's presidential papers."  (Def.'s Opposition at 9, Doc. No. 29.)  The Commissioner argues that this case is really about money, not medical supplies and services, because Franklin Memorial "could comply with its free care obligations by paying doctors to treat indigent patients and by buying for those patients any necessary medical supplies."  (Id. at 10.)  This point is interesting because that is essentially how Franklin Memorial characterizes its case at the factual level, in terms of the revenue these supplies and services would fetch from the average paying customer.[5]  Indeed, given the non-profitable nature of the market in question (charity patients), Franklin Memorial must, prospectively, restock supplies and retain staff with the expectation that a portion of the supplies and a portion of its staff's labor are effectively earmarked for non-economic use because the costs will be lost from an

---

[5]    As indicated before, there is no factual basis to support a finding that these supplies and services would fetch a market price from the Free Care Law patient population in the absence of the access requirement.  This is due to the fact that Franklin Memorial indicates that it will provide health care to this population even in the absence of the Free Care Laws, understanding that it will not realize a market rate for its provision of supplies and services. There is no factual basis to understand how its actual costs might relate to likely revenue for this patient population.

investment standpoint.  Thus, the crux of this controversy is, in effect, the fact that monetary outlays will be made without the prospect of any return on investment, *unless* the government can be made to pay a rate in excess of the costs.

These particular, *ad hoc*, characteristics make this case dissimilar to <u>Nixon</u>, which involved an individual claimant having distinct profit expectations in, and a personal desire to exclude others from, the personal property in question.  Here we have a public-benefit charity, with community health as its mission, which has not expressed any desire to withhold any needed supplies or services from the patient population in question, and which expresses only the desire to negotiate contracts for care that would, on average, serve to recoup some portion of its costs.  As even the <u>Nixon</u> Court acknowledged, there is a "distinction between regulation affecting one's relationship to those *voluntarily* admitted to property versus government action *compelling* an owner to allow continuous access to third parties."  <u>Id.</u> at 1286 (emphasis in original).  Because there is no desire to exclude others from the property in question, and because Franklin Memorial has purchased and retained the supplies and labor understanding at the outset that a portion of both will go to some patients for free, the Free Care Laws do not actually force a public "appropriation" here, but really impose a limited servitude on the operation of this health care facility.  Although economic losses in relation to specific items of personal property could amount to a taking, the *ad hoc* characteristics of the relationship this particular takings claimant has toward the property in question weigh against the application of a *per se* rule that the Free Care Laws have effectuated a taking of its property.

My conclusion that the facts of this particular case do not warrant an axiomatic finding of a taking does not necessarily mean that just compensation is not owed to Franklin Memorial based on an overall balancing of the relationships among the character of the government action,

16

the economic impact, and any interference with investment-backed expectations.  It only means that the ready-made *per se* rule of <u>Loretto</u> does not fit this particular scenario well enough to make the right disposition easy to determine.

In <u>Yee v. City of Escondido</u>, 503 U.S. 519 (1992), the Supreme Court observed that where the *per se* rule is not determinative, and "where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." <u>Id.</u> at 522-23.  This kind of scenario "necessarily entails complex factual assessments of the purposes and economic effects of government actions." <u>Id.</u> at 523.  The economic effects have already been discussed in terms of the economic impact and investment-back expectations factors of the <u>Penn Central</u> test.  What remains is a consideration of the particular burden placed on Franklin Memorial and whether the public should bear it, in fairness.

Returning to the groundwork, the Fifth Amendment injunction against the uncompensated taking of private property for public use is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." <u>Armstrong v. United States</u>, 364 U.S. 40, 49 (1960).  Whatever category a particular claim falls under, every analysis "focuses directly upon the severity of the burden that government imposes upon private property rights." <u>Lingle v. Chevron</u>, 544 U.S. at 539.  Here, the Court is presented with a regulation that is designed, quite nakedly, to mandate access to private property for public benefit.  Thus, despite all of the subtle qualifications that evade a *per se* approach, this characteristic of the regulatory scheme places a significant weight on the scale in favor of the claimant.  But even still, "[g]overnment hardly could go on if to some

17

extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922).  Thus, it is well-recognized, "in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values." Penn Central, 438 U.S. at 124.  In particular, with respect to personal property associated with commercial dealings, a property owner "ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." Lucas, 505 U.S. 1027-28 (citing Andrus v. Allard, 444 U.S. 51, 66-67 (1979) (relating to a prohibition on the sale of certain birds or articles made from them)).

       In Allard, the Supreme Court held that a taking did not result when the federal government banned the sale or transfer of protected birds and their parts.  Specifically, the Court rejected the notion that the ban violated the Fifth Amendment for "wholly depriv[ing]" the owners of such birds or artifacts made from them "of the opportunity to earn a profit" from their sale.  Allard, 444 U.S. at 64.  The Court concluded in that situation that it was sufficient "to say that government regulation—by definition—involves the adjustment of rights for the public good.  Often this adjustment curtails some potential for the use or economic exploitation of private property.  To require compensation in all such circumstances would effectively compel the government to regulate by *purchase*." Id. at 65.  Supportive of the Court's decision, however, was the fact that the owners could at least retain the artifacts, even though they no longer had the same economic value, whereas here, the health care provider must afford access, which effectively expends the supplies and the labor in the permanent sense.  Id. at 65-66.  On the other hand, the supplies and services at issue in this case are owned by Franklin Memorial for the very purpose of providing them to the patient population at large, even when compensation cannot be

18

obtained.  Moreover, as already discussed, the economic value of the supplies and services

utilized for the benefit of the Free Care Law patients is very uncertain.  There is no clear way on

the existing record to discern whether any net gain is even feasible.  If, as the <u>Allard</u> Court

observed, "the interest in anticipated gains has traditionally been viewed as less compelling than

other property-related interests," <u>id.</u> at 66, what then is to be said of the interest in anticipated

losses arising from a non-profit entity's public health mission?  This seems to be a rather "slender

reed upon which to rest a takings claim," <u>id.</u>, especially when the factual presentation does not

permit a comparison of this burden to the benefit that Franklin Memorial realizes from other

public programs that actually contribute to its gross revenues.  It is not difficult to imagine, for

example, that Franklin Memorial's revenue from other public programs, or better yet, the profit

from such programs, exceeds the financial burden imposed by Maine's Free Care Laws.  Do

these various state programs, in the aggregate, cover, or more than cover, the cost of the related

supplies and services?  If so, then is not the public essentially bearing the costs?  Indeed, in order

to understand whether the public should bear the burden of paying the cost of the burden that

Franklin Memorial complains of, it would be beneficial to understand more clearly that the

public is not, in fact, actually paying the cost of the Free Care Laws through other public health

programs and funding channels.  Franklin Memorial has made no effort to refine the economic

picture in that regard, attempting instead to steer clear of the larger economic picture by relying

primarily on arguments for a *per se* finding.[6]

     Ultimately, in my view, the better approach to this case is to reduce the level of

magnification so that we are not focusing narrowly on the individual supplies and services that

---

[6]     I recognize that the Court has already dismissed a portion of Franklin Memorial's case that challenged the Maine Medicaid (MaineCare) program, but that dismissal did not preclude Franklin Memorial from presenting a more complete picture of the overall burdens and benefits of Maine laws and regulations pertaining to the public health care market.  (See Order on Mot. to Dismiss, Doc. No. 16.)

are consumed by the Free Care Law patients, but instead on the overall operation of the health care facility that is the real economic enterprise that is regulated by the Free Care Laws and related state health care law.[7]  When viewed through this lens, the picture changes and presents a form of regulatory administrative burden arising from a "public program adjusting the benefits and burdens of economic life [within the public health realm] to promote the common good." Penn Central, 438 U.S. at 124.  That burden is quite clearly not on par with a classic taking because the overall economic impact is far from debilitating and does not significantly interfere with investment-backed expectations related to Franklin Memorial's gross output in supplies and services.

In my judgment, it cannot fairly be found on this record that the burdens evident in this overall factual scenario, to the extent it has been developed, reach the magnitude of a regulatory taking under the standards applicable to the Takings Clause of the U.S. Constitution.  Although Franklin Memorial insists that it cannot be made to pay for supplies and services for the benefit of the Free Care Law patients, "it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another."  Connolly v. Pension Ben. Guaranty Corp., 475 U.S. 211, 223 (1986) (concerning employer's financial liability in relation to employee pensions).  This is another circumstance in which the Clause is not violated by a mandatory transfer of assets to adjust the burdens and benefits of economic life.[8]

---

[7]     Cf. Penn Central, 438 U.S. at 130-31 ("'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.  In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole.").

[8]     Both parties reference cases related to the mandatory provision of *pro bono* services by attorneys, particularly the Eighth Circuit's consideration of such a factual scenario in Williamson v. Vardeman, 674 F.2d 1211 (8th Cir. 1982).  There, the Court concluded that a taking had not occurred where the state court ordered the plaintiff

B.      **Takings Under the Maine Constitution**

Franklin Memorial advances its takings claim under both the United States Constitution and the Maine Constitution.  (See Compl. Count I.)  It argues that the standard utilized by the Law Court to determine when a taking must be compensated under the Maine Constitution is lower than the standard set by the Supreme Court for the Takings Clause of the U.S. Constitution.  (Pl.'s Mot. at 11-12.)  The Commissioner responds that the Law Court would follow federal precedent on takings with respect to the sister provision of the Maine Constitution, despite the Law Court's usage of somewhat different language to describe the standard.  (Def.'s Opposition at 15-16.)

The Maine law standard is drawn in terms of whether the "use or enjoyment of property has been seriously impaired, . . . or whether property value has been substantially diminished."

---

attorney to represent an indigent criminal defendant even though the state would not pay for the expenses related to that defense, which was alleged to require several depositions, a private investigator, and possible retention of expert witnesses.  Id. at 1212-13.  The Court observed:  "The vast majority of federal and state courts which have addressed the due process issue have decided that requiring counsel to serve without compensation is not an unconstitutional taking of property without just compensation."  Id. at 1214 (collecting cases).  This duty to serve is considered to arise from an attorney's "status as an officer of the court."  Id. at 1215.  In the Commissioner's view, attorneys and law firms are to the legal profession what doctors and hospitals are to the medical profession, so that the privilege of being licensed to practice in these professional institutional spheres comes with certain obligations to those members of the public who cannot afford access to these institutions.  (Def.'s Mot. at 10.)  Franklin Memorial, on the other hand, argues that, even if this comparison holds water as to the provision of services, the difference here is that Franklin Memorial is required "to provide its personal property and goods for free, [and] to expend its money and pay for costs for free." (Pl.'s Mot. at 7 n.2.)  If Williamson governed here, it would back Franklin Memorial up on this point, holding that, while a court may order an attorney to provide free services, it cannot order an attorney to pay the expenses of a defense because "[t]he class of lawyers has no more obligation to pay such expenses than any other class of citizens."  Id. at 1215.  In this case, I have concluded that the burden imposed on Franklin Memorial is different, because Franklin Memorial is already an economic enterprise designed to provide free care to some of its patients and is not seeking to exclude people from access to its medical supplies.  Additionally, Franklin Memorial derives a significant amount of revenue from other state programs and Franklin Memorial's failure to include that revenue in its presentation has prevented the Court from weighing those possible benefits against the burdens of the Free Care Laws.  In this case Franklin Memorial has brought a takings claim because it wants to be able to exercise the right to choose who will receive free care, who will receive steeply discounted care, and who will receive little or no discount, all with respect to a small population of patients who do not otherwise qualify for coverage under other public health programs.  The Free Care Laws resolve that question in a uniform fashion.  Franklin Memorial's desire to recoup some fraction of the costs of supplying care to this cross-section of patients is understandable, but the burden of not recouping those costs is not a taking unless it is unjust when measured against the benefit Franklin Memorial receives from other programs funded by the public.  The summary judgment factual presentation does not permit that kind of analysis, which is why I recommend that the Court enter judgment for the Commissioner.

York Hosp. v. Me. Health Care Finance Comm'n, 719 F. Supp. 1111, 1125 (D. Me. 1989) (citations omitted).  More likely than not, the Law Court would follow well-established federal takings jurisprudence when deciding a Maine law takings challenge.  This case, however, presents a novel question that is not easily resolved by resort to existing precedent.

If the Court agrees with the interpretation of federal law that I have set forth herein and decides to enter summary judgment against Franklin Memorial's sole remaining federal claim, it could conclude that the analysis is also sufficient to resolve the Maine constitutional law question.  However, because the question is so very close and contentious, I recommend that the Court decline to exercise supplemental jurisdiction and dismiss the state law claim without prejudice.  See Learnard v. Inhabitants of Van Buren, 182 F. Supp. 2d 115, 127-128 (D. Me. 2002) (declining supplemental jurisdiction over contentious issues of state law).

## CONCLUSION

Franklin Memorial has failed to present a factual record at summary judgment capable of supporting a finding that the challenged regulatory scheme "goes too far," in the words of Justice Holmes.  Mahon, 260 U.S. at 415.  For the reasons stated above, I recommend that the Court DENY Plaintiff's Motion for Summary Judgment on Count I (Doc. No. 24) and GRANT IN PART Defendant's Motion for Summary Judgment on Count I (Doc. No. 20), by entering judgment for the defendant on the federal takings claim and dismissing without prejudice the state law takings claim also contained in that count.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought,

together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 24, 2008